Good morning and welcome to the Ninth Circuit. It's a pleasure to be joined by my colleagues, Judge Tallman and Judge Clifton, and we're grateful for counsel. We know we've got a triple header up front, so we're looking forward to that. You know, keep in mind we've got about 10 minutes each case against one and we have 15. There are overlapping issues, so just be aware we've read everything and try and the case-specific arguments in each of the cases, but there's probably enough nuance that you'll find your way through it. We do ask that you just pay attention to your time, let us know if you want to reserve time, and then sum up as your time is expiring. And we'll go ahead and proceed with argument, and we'll start with Seagraves v. Washington State Department of Children Youth and Families, and that one is case number 25-3282. Nathan J. Arnold Good morning. Thank you, Your Honor. My name is Nathan J. Arnold, representing the appellants in this case. I would ask the court to allow me three minutes of time for rebuttal, please. Okay, watch your time. Thank you, Your Honor. First, some framing, Your Honors. This is not a facial challenge to a vaccine mandate or proclamation. This is an as-applied challenge, and it's an as-applied challenge to the implementation of DCYF's policy as it related to COVID-19 vaccination requirements. This is also a Rule 12 dismissal that we're challenging, so we're at the pleading stage, whereas the court is well aware our well-pled facts are accepted as true, and that is our procedural posture. There's two main issues here on appeal. That is, did we plausibly allege a free exercise claim, and did we plausibly allege a due process claim? There are also state court claims that were dismissed for want of jurisdiction. I wanted to ask you about your free exercise claim because, so the district court cited the, I apologize, the Stormins case, and Stormins does say an exemption that affords some minimal government discretion does not destroy a law's general applicability. Why doesn't that control here, in your view? Here, Your Honor, by the fall of 2021 through the cases of Lukumi, Tandon, and Fulton, it was clear that when there is a system of individualized exceptions to a government policy that could result in secular activity that would undercut or undermine the stated compelling governmental interest, that then strict security would apply, and that also those same types of exceptions should be afforded to those who had religious objections where the conduct for which an exemption is being sought would similarly undermine the stated compelling governmental interest. Okay. So the way you just framed it, you seem to be relying on the difference in treatment between secular exemptions and religious exemptions. Is that your argument? I think there's a little bit more to it than that, Your Honor. I believe where, I believe the law from the Supreme Court after those three cases I just cited is that when there is even a mechanism, whether or not it's used, and in this case, I believe we did allege that it was in fact used, but when that mechanism exists where a government entity is able to afford the secular exception to the rule and where that conduct that's being accepted could undermine the compelling governmental interest, the same entity is required to afford those same, that same leeway to the religious, and that it also triggers strict scrutiny of the policy. What evidence is there or what allegation that is plausible, what factual allegation suggests that in fact they were treated differently? Everybody we're talking about here got exemptions, so the question isn't, and most of the allegations seem to pertain to an alleged resistance to giving religious exemptions, but in fact every, all of your plaintiffs got exemptions. The question was were they given accommodations and what facts were alleged that make plausible the claim that people who obtained religious exemptions were treated differently? And in the first instance, your honor, is absolutely correct. This case really is not about the exemption process. As the court is aware, we're talking about a two-step process. There's exemption and then those that are exempt are accommodated. Basically everybody was exempted, whether they had a medical exemption or a religious exemption. The question is accommodation. Yes, your honors are both absolutely correct. The issue here is accommodation, and in this case, what we have is... But where the employer says the numbers of employees involved are so great that it will have an adverse impact on the mission of the agency and the need to protect the children and families from the disease, why is that interest not compelling? I do not argue that the government generally and DCOA particularly did not have a compelling interest in protection of disease. There's no question about that. Maybe I didn't frame my question very well. My question really is, based on the number of employees involved, the employer basically said, I can't accommodate all of these exemptions, whether they're medically based or religiously based, because there are too many and it's going to have an adverse impact on the mission of the agency to protect children and families. A couple of things on that point, your honor, and I hope I answer your honor's question as well with this. That analysis is not appropriate at the pleading stage. We have pled, for example, the individuals, these individuals could continue their work utilizing telework and- You have pled that, but you have to offer up facts that make that allegation plausible. And I found zero facts alleged that make that plausible. What facts were alleged that make the claim that people with religious exemptions are treated differently? What backs that up? There is data that we included in our first amendment complaint, your honor, that shows a statistically significant difference in the rate at which secular individuals were accommodated relative to the religious. What were the numbers for people who got religious exemptions? I was going through the exhibits attached to your complaint and I found that this department, for people who are given religious exemptions, granted accommodations in 105 cases and denied them in 111. That doesn't sound like a lot of animus to me. It sounds like they're figuring out, okay, what jobs can these people do? Because if nearly half the people that were given religious exemptions were accommodated, how does that demonstrate a plausible claim for religious animus? In your honor, I believe that those at a later procedural posture, perhaps a summary judgment, perhaps a trial, a defense that could be raised is- Any facts that make the allegation of animus plausible, and that's what you're required to do at the pleaning stage. So I've asked you, my question is, what facts have you alleged that make that allegation plausible? And so far, I haven't heard anything. I apologize, your honor, for not- Let me try to answer more directly on point. There is, as we've alleged, there was a disparity between the rate of accommodation vis-a-vis the secular and the religious. But I just gave you the numbers offered in your complaint for the religious, and if half the people are granted accommodations, how can that possibly, plausibly support a claim of religious animus? It could if the number of secular individuals that pose the same risk of undercutting the stated, the compelling government interest was significantly- And how many secular people were there? I looked, I thought I found 14. I mean, it's make plausible the allegation that they were out to get people who claimed religious exemptions. So your honor, there's a separate set of facts that are alleged in our complaint, and that is internal communications by the secretary, who's the highest policymaker- All of which have to do with granting religious exemptions, but we've already established that everybody got the exemption. The question was accommodations. And I've got to say, another question I have is establishing the personal involvement of the director of the Who gets accommodations for what job? I mean, the district court observed that there really weren't any allegations with regard to the personal involvement of the individual defendants. And I think the district court probably got that right. What can you point to that suggests that wasn't right? Well, Judge, under the case of, I believe it's Starr v. Baca, a policymaker who sets in motion a policy that results in a constitutional deprivation- But all of the things you've cited have to do with granting the religious exemptions, and we have established that everybody got the exemption. What you've offered up doesn't appear to talk about the involvement of the director with regard to who gets accommodated. And your honor, I believe that some of the director's communications that I believe drawing an inference in favor of my clients at Rule 12 would indicate some religious animus. For example, when the director talks about, or the secretary, rather, excuse me, talks about religious exemption and accommodation requests, he talks about whether they're real or imagined. And he talks about hiding behind an exemption strategy- Let's talk about the exemption. But that doesn't talk about once you've gotten an exemption, who gets an accommodation. I think that it can flow from statements indicating that religious beliefs are real or imagined, or that they're hiding behind the process. I believe they can then flow to show animus in both the exemption and the accommodation phase, contrasted to when the secretary- Not to show animus. I mean, that's- So I had thought, and I want to make sure I'm clear on this. I had thought that one of your arguments was just the discretion that was available. Now, the question, there's discretion in the exemption, but as we've all acknowledged, most of those exemptions were granted. Can the discretion available in the accommodation also be a basis, separate and apart from any disparate treatment of the secular accommodations? Yes, Your Honor. I believe that is correct under the cases that I initially cited of the line of Lukumi, Tandon, and Fulton. Once that individualized mechanism exists, then it brings this under the ambit of strict scrutiny and the government is- I mean, the district courts seem to agree with you in that respect because it analyzed discretion. It said the discretion was not too much, and that's why I started with Storman's, because Storman says, look, if there's just minimal discretion, you're fine. That's our case. Is Storman's still good law after Fulton, or do you think Fulton sets forth a different standard that comports with Storman's but gives you a basis for arguing that strict scrutiny should apply here? I am confident that the law under Fulton that postdates Storman's is the proper test, but I think there's more than just a quantum of discretion, and I think that's present here where there was essentially- Or at least that you've alleged that. Yes, Your Honor. Our allegations, again, rule 12 standard here. There was discretion available for the government entity in this case to essentially pick who are the winners and the losers, and when the government has given themselves the mechanism to pick the winners and the losers, that then raises strict scrutiny if it infringes upon free exercise in more than most incidental manner, if we're looking back as well to Smith. And this, I would suggest, Your Honors, is more than an incidental impact on free exercise. If we agreed with you that strict scrutiny applied, is your position we could reverse, or that we would just have to remand on the free exercise claim to have the district court conduct a strict scrutiny analysis? I think that the narrowest relief that we're seeking today is remand to the district court. So that'd be the most narrow that we are seeking. As far as reversal, I believe that- That's a taller order. Certainly, Your Honor. But to answer your question, that is the- You'd like it. Well, certainly, Judge. Okay. All right. We'll give you some time for rebuttal. Thank you, Your Honor. Thank you. Good morning. May it please the court, Zach Picalis for Appelese. As Judge Nelson observed in his opening remarks, there's some overlapping and important issues across all three cases today, and I'd like to address four of them at the outset. First, with respect to the free exercise claims, differential treatment of medical and religious accommodations does not destroy the general applicability of a vaccine mandate as this court and at least four other circuits have held. And the Supreme Court said almost as much in tandem. I mean, it's confusing to me where that plays in, but I think you're right. That's why I was a little surprised that counsel was leading with that one, because my concern on the free exercise claim is the discretion that's given. And that's my second point, Judge Nelson, another overlapping issue. The government does not create a mechanism for individualized discretionary exemptions simply by allowing workers to seek medical or religious accommodations under the governing law, Title VII, the WLAD, the ADA. Okay. And every circuit has held that too. But let's back up on that, because the problem that, and I'd be interested in hearing your response to this, because the district court cites San Jose United School District, but it doesn't really cite the relevant language. I mean, San Jose School District says flat out unfettered discretion. You don't have to have a claim of unfettered discretion in order to trigger strict scrutiny, but the district court doesn't cite that language. And the district court says, well, under individual defendants did not exercise standardless discretion. I don't know what the difference is between standardless discretion and unfettered discretion. I think it becomes about linguistic somersaults at that point. Well, but it must mean something because then in Stormont's we say, okay, if you only have minimal discretion, you don't get to strict scrutiny. So there must be some difference between minimal scrutiny, unfettered discretion, or minimal discretion, standardless discretion, unfettered discretion. Let's just step back and think about what this so-called individualized discretionary exemption process is. It's existing law. That's what the proclamation says. It means make sure that you apply title seven, make sure that you apply the ADA and the WLAD and allow employees to request accommodations, lest you think that somehow this doesn't apply. So like, for example, in a lot of the New York vaccine mandate cases, healthcare workers were not eligible for any accommodation that would have allowed them to be unvaccinated and continue their jobs. And that by itself represented an undue hardship. That's not the case here. In this case, we have the proclamation saying, no, we want our workers to be able to apply for exemptions and accommodations under the governing law. So think of the circularity of that theory, that the very process by which these plaintiffs, these employees are seeking an accommodation, they're now claiming that whole process renders the law unconstitutional. It puts the first amendment at war with title seven. The second part, the exemption part, which it turns out doesn't really factor because everybody gets the exemption. So it's the accommodation part that becomes an issue. What are the decision making elements there? What are the decision points? What guidance is there to decide who gets accommodated and who doesn't? Well, this foreshadows the last of the three cases today. It's really it becomes the undue hardship standard under title seven and the ADA. And in this context, as this court held in Peterson and more recently in Williams, it is an undue hardship where an unvaccinated employee presents a greater risk, a greater realistic risk of contracting and then spreading COVID to coworkers or members of the public. Well, I disagree with your reading of that. That can't be that. That can't be what Peterson said. Peterson said, I mean, it can't just be a greater risk because if that were the case, then you would never give any accommodation at all because everybody agrees that there's a greater risk if you have more people there. So that can't be the distinction. It has to be more nuanced than that. Respectfully, I disagree. I believe this circuit and every circuit to address the issue has held that where the evidence shows that an unvaccinated employee has an increased risk of contracting and therefore spreading COVID, that does represent an undue hardship as a matter of law. But this is foreshadowing the Nielsen case at the end a little bit. I was just answering Judge Clifton's question about what guided the decision making here. One of the problems here is that the departments have services they need to render. So it can't be that they simply say we won't take any risk. We're not going to have any employees doing anything because then you don't serve, in this case, the children, youth and families, or in other cases, the health care needs of the community. And so what did the department do when it went through the process of deciding? And the numbers that I suggested before suggest that 105 got accommodated and 111 didn't. So what was used to separate those groups? What was the decision? Judge Clifton, fundamentally what drove the decision was whether the individual's jobs, whether the essential functions of their job required close in-person contact with others. So as Judge Clifton, as you mentioned in my colleague's argument, the record shows that 108 DCYF employees were accommodated mostly because they were able to do their jobs virtually, remotely, whereas employees here who included juvenile rehabilitation counselors, juvenile prison guards, registered nurses, those jobs were deemed incapable of being done in person and carried an undue or realistic risk. Peterson and Williams, if I'm not mistaken, I got to go back and look, were both summary judgment records. That's correct, Your Honor. So that's what's troubling to me here. There is something about this motion to dismiss stage where, I mean, how are we supposed to decide this? Like, I mean, we don't know. They've alleged that the discretion was used wrongly, that there was too much discretion. Why aren't they entitled to get some discovery on that? Well, the same allegation was leveled in PILS on a facial challenge. But again, the same standard should apply. And this court, and Judge Nelson, you were on the panel, held that the proclamation itself, even though it allowed accommodations pursuant to existing statutes, did not create an individualized exemption process. Similar, again- That was in MemDispo, if I remember right. It was. It was, Your Honor. But through the lens of qualified immunity, which I really want to mention here, again- I get these cases all mixed up. Do you have qualified immunity in this case? We have qualified immunity, yes, for the 1983 claims, which is all that are issued. I mean, I don't, maybe I'm showing my cards, but I don't have a problem with your qualified immunity argument. I mean, there's no case. I mean, the closest we have that would support the plaintiff's is Bacon, which I authored and is very different than this case. I agree, Your Honor. And the Supreme Court's recent decision in Zorn v. Linton, I think, articulates the qualified immunity standard very clearly. The relevant precedent must define the right with a high degree of specificity such that every reasonable official- No, I think, to me, it just comes down to, are they entitled to get past a motion to dismiss? And I haven't formulated in my own mind where the discretion has to be. I mean, it also can't be that anytime you just say, well, look, look at it on paper, because they're not raising a facial challenge. They're saying that it was in practice wasn't used right. So it can't be that you can just hide behind saying, well, we said to comply with the law. So you don't get to look at how these individual decisions were made, because we look at our paper. It said comply with the law. But isn't the problem at the pleading stage that they just don't allege sufficient facts to establish a prima facie case? They don't. It's just a conclusory allegation of excessive discretion. And if you actually look at the- And as Judge Clifton points out, if they're basically given an equal number of accommodations, then it's hard to see where the discrimination lies. Well, so I think the record can be read. And the key- These are documents incorporated to the complaint. It's at 5 ER 87983. That could be construed to suggest a different rate of accommodation grants for medical and religious. But Judge Tolman, as you pointed out, there were like three times as many, excuse me, far more. There were over 384 religious exemption requests and 69 medical accommodation requests. And as the court did recognize in San Diego School District and every other circuit has as well, that's greater volume. To use your phrase, Judge In an agency which employs how many people? Is that in the record? It's not in the record and I don't have it offhand, Your Honor. I'm sorry. It's big. It's very big. Just one quick thing on qualified immunity. If the court does rule on qualified immunity, then it has to address the ex parte young claim. And I think for this case and really all cases, the argument has not been preserved either because it was not raised properly in or because it hasn't been briefed on appeal. I see my time's expiring. I can say more about that or I think you'll, you'll get a chance to take another swipe at this in another case. One specific question about the ex parte young. When was this action filed in the district court? I confess there's so many cases that I've lost track and under a case law, it might make a difference. So do you happen to know, or could you at some point provide us with that information? Yeah. And is the question, was it filed before, after the proclamation was rescinded? Correct. I'll, I'll check and get back to you. Thank you. Thank you, Judge Clifton. And for those reasons, we ask that the court affirm. Thank you. We'll give you a minute for rebuttal. Thank you, Your Honor. As you pointed out, Judge Nelson, Peterson and Williams are both summary judgment cases. So tell me what, what, what do you have in here that to, to judge Talman's question, what gets you over that hurdle? And can you analogize it to Peterson? Let's see your cards. So those are also cases where, um, there was no, it was unrebutted expert testimony on the other side here. That's how did they get past rule rule 12? That's what I want to know why Peterson and Williams went to summary judgment and you didn't. And I'd like to know what allegation you made that you can point to as comparable, uh, with, with what was made in Peterson and Williams to get to that stage. Um, so here, and I think we can also draw that same question with Bacon. Here we have, um, a showing of under inclusiveness where we have the secular exemptions that are being granted. We've also alleged, and this is something that can't be about exemptions because everybody's exemption got granted. What can you point to that accommodations were granted differently? And I got to tell you, your brief doesn't say anything about the job duties of the plaintiffs. So we don't have anything there that we can work with to decide, well, this accommodation denial isn't consistent with what we would logically understand and what the state suggested, which is who, who dealt with the clients or customers of the department, the children, youth, and families, and who had things they could do entirely remotely. And I don't see anything that helps us with that. Certainly not in the briefing, but I go back to the complaint. What makes plausible the allegation that people who got religious exemptions were treated differently? What can you point to from the complaint? What facts were alleged to make that plausible? And your honor on a plaintiff by plaintiff basis in our first amendment complaint, we do allege that they could have done their job functions remotely. Um, but we don't know what the job functions were. That's, that's the concern we're, we're, we're dealing with here. And perhaps that's something that would be appropriate on a minute. I believe we listed job titles, um, job functions or something that we could add on amendment though, um, which actually to answer judge Nelson's final question of what is the narrowest grounds or it would be a remand with leave to amend would be the most narrow grounds. Now you're B because before you were, I read your motion for leave to amend, not to address what we're talking about now, but more to defendants or other claims. But now you're saying you want leave to amend to allege more specificity on actual job functions. Uh, when I'm hearing, um, the panel having a pause because of that, then certainly your honor. What's giving me pauses as you're trying to discover your way into pleading and that normally we don't allow that. You don't, you don't get to defeat a motion to dismiss on the pleadings by saying, I just need more discovery in order to figure out what my case is all about. I absolutely agree with that, your honor. And I think here we have plausibly alleged our claims pointing to specific, for example, specific communications by the secretary in this case, even without the benefit of discovery. So these aren't allegations where one can that one statement about, you know, we need to do this as strictly as the law allows to paraphrase that doesn't for me, doesn't get me there. I agree. Your honor, that that statement alone would not get me there either. But what we have is a contrast where the sector, the policy, the top policymaker in this department is saying until we find a quote unquote safe, and that's his language, not mine vaccine for the medically objecting, how are we going to get a pathway for these people? And then when he talks about religious exemption and accommodation process, he did give some accommodations here, right? They did, your honor. Yes. For religion, they gave some religious accommodations here. That is correct. I mean, it's a lot better than a lot of these other cases. So I certainly agree with that. We'll get to that. What was the date you filed the suit? The date? Yes. I want to say it was January of 24. Let me confirm that right now. So that would have been after the governor's proclamation was withdrawn? I think that's right. I don't have that date offhand, your honor. I can confirm it was January 30th of 24. I believe that is correct, your honor, but I can't swear. All right. You can check it while we're waiting for the next. I certainly will judge. Okay. All right. Any, any other questions? It just occurred to me. It should be here. No. Oh, well. You're good. I'm good. Who are you looking for? Okay. Well, I'm just looking. I realize, oh yeah, the complaint was filed on January 30th, 2024. It's in the exorcist record. I didn't think about that. So the complaint, you're right. It's January of 2024. And I'm pretty sure the proclamation was rescinded in sometime in 23, but that's a factual matter we can figure out. That is correct. And that does go to the ex parte young issue, particularly under the recent en banc decision by Carvalho, which I will freely concede ended any substantive due process claim that my clients may have had. However, it also held that reinstatement is appropriate perspective injunctive relief, even after the policy or mandate has been rescinded, but we still have to be something to be true. If the litigation was underway, I mean, Judge Nelson's recent opinion talked about restoring the status quo, but if the status quo at the time that this lawsuit was filed was post rescinding of the proclamation that we're not talking about going back to the there was no constitutional violation. It based in your allegations at the time the litigation was commenced, but the continuing violation doctrine. Yes, I believe that's correct. There's a continuing violation doctrine, but also I think we the court should be aiming to restore the status quo at the time of the violation, not the time of filing of the suit, but you still have to have a continuing violation in order to invoke the equitable remedy. And that goes to your honor's earlier point. There has to be a violation, of course, first. And so our position here is that we plausibly alleged violations of free exercise and due process that are ongoing where these individuals have not been reinstated. Those are two separate questions. I mean, you could win on one and not the other. Absolutely, your honor. Or lose on both. Certainly. We'll find out. All right. Thank you. Thank you for your arguments in the case. The case is now admitted and we'll move.
judges: TALLMAN, CLIFTON, NELSON